hDUFRESNE, Judge.
This is an appeal from a judgment in a suit involving a fixed-price construction contract. Because we find no legal or manifest factual errors in the actions of the trial judge, we affirm that judgment.
In late 1990, American Cyanamid Company sought bids for work on some 1300 feet of drainage ditches on either sides of a street running down the center of its chemical plant. The plant is located on the west bank of the Mississippi River in Avondale. The ditches begin at the north end of the property, nearest the river, where the elevation is about 13 feet above sea level. At the south end, where the ditches flow into an intercept ditch, the level is about 7 feet. The intercept ditch in turn flows through an adjustable-level weir and into the swamp. The job involved cleaning, dredging, and grading the drainage ditches to provide for the 6 foot drop from the north to the south ends, paving the sloped sides of the northern 650 feet, and smoothing the earthen sloped sides of the southern 650 feet. The bid drawings indicated a number of concrete obstructions related to |2both obsolete and functioning works which would probably need to be removed or reconfigured during the project, and made reference to more complete drawings in the plant’s engineering office which could be consulted for the precise nature and location of the underground portions of these structures. These difficulties were discussed with potential bidders in the pre-bid walk-through.
JOH Construction Company, Inc. was originally awarded the job on a fixed-price contract for $220,250.00, on a 180 day completion basis, but for an additional $4,000.00, JOH agreed to finish the job in 75 days. Cyanam-id was interested in the shorter completion time because it was planning a shut-down of the plant for maintenance work in early May *1241 and did not want the drainage ditch work going on at the same time. The contract also provided that JOH was responsible for maintaining adequate drainage of rainwater through the ditches during the work. JOH subcontracted with McMillion Dozer Service, Inc. for a part of the work for $42,602.00, later amended to $48,552.00, and also as a separate item leased from it on an hourly basis several pieces of heavy equipment.
The job began on February 18, 1991, and progressed uneventfully until April 2, when the JOH crew encountered a concrete manhole structure that could not be identified from the original bid drawings. Louis Deutschmann, the superintendent on the job for JOH, contacted Raymond Thompson, Cyanamid’s senior project engineer, for further information about this structure. Thompson testified that he told Deutsch-mann to have his crew carefully excavate around the it to see if anything went into or out of it, and if not to dig the whole thing out. While the record is not clear on this point, it appears that the workers did do some excavation, but did not lago deep enough to uncover a 14,000 volt electrical line beneath the structure. When they pulled it out of the ground, the electrical line was severed causing most of the plant to shut down.
An electrical contractor was immediately called in to repair the electrical line. This project took several weeks, during which time work on the drainage canals was temporarily disrupted. Erie Heidingsfelder, project manager for JOH, testified that at the time of the electrical problem the canal work was two to three weeks from completion. He said that because of the electrical repair, all of the water in the canal where the line was located had to be pumped into the canal on the opposite side of the street, thus effectively preventing any substantial work from being done on either canal. He noted that the early-May maintenance shut-down further delayed his crews, especially because it caused routine delays in issuance of the daily safety permits, without which JOH was strictly forbidden to begin work. Finally he explained that an extremely rainy summer, particularly from May through August, caused additional loss of time because of excess water in both the canals and the rear intercept ditch which necessitated the building of temporary dams on the upper as well as the lower ends of the daily work area, and extensive pumping to keep the dammed sections dry.
Chad Dantin, who had replaced Raymond Thompson as Cyanamid’s man in charge of the job, testified that the project was in fact only about 50% complete at the time of the accident. His explanation for JOH’s lack of progress was bad crews and lack of continuity in field supervision. He agreed that the electrical repair and the shut-down caused some disruption, but that both problems ended by May 10, when the shut down fended. From that point there were no restrictions on JOH’s work. He also pointed out that Cyanamid had approved of an additional $55,000.00 worth of work, lasting about a month during April and early May, so that JOH could utilize its crews on these other jobs while the canal work was disrupted. He did not believe that issuance of the daily safety permits, usually within a half hour of the usual starting time of 7 AM, caused any significant delay, and it was also shown that JOH had worked for Cyanamid in the past and was familiar with the daily issuance of these permits when it bid the job. Dantin did agree that the summer had been extremely rainy, probably causing loss of another month’s time, but he did not believe that anything else done by Cyanamid could have delayed the canal work until September 6, when it was finally completed. Raymond Thompson was of the opinion that JOH had inadequate pumps and hoses to control the water problem throughout the job, and had mentioned this to the JOH supervisor. He also thought the job was only 50-65% done when the wire was severed.
Shortly after completion, JOH submitted claims to Cyanamid for payments of $187,-000.00 above the contract price, mostly due to costs allegedly occasioned by the various delays. In addition, several sub-contractors and suppliers filed liens against Cyanamid for amounts still owing them by JOH. Several of these liens were satisfied by Cyanamid, but the claim of McMillion Dozer Service, Inc., for $116,624.83, most of which was for *1242 equipment rental, could not be resolved. McMillion thereupon sued Cyanamid and JOH for payment. Cyanamid asserted that JOH was solely responsible for this debt, and JOH claimed otherwise and further sought additional payment from Cyanamid under the contract.
By the time of trial it was uncontested that Cyanamid had withheld |s$65,846.18, owing to JOH under the contract, but had paid $104,-383.50, on outstanding liens, $45.000.00 of which had gone to McMillion. At issue at trial were thus McMillion’s claim for the remaining $71,624.83, against Cyanamid and JOH, and JOH’s claim against Cyanamid for additional payments for the work done. There were no claims by Cyanamid for damage to the electrical line, nor for any delay damages relating to JOH’s failure to finish the project within the original 75 day period.
After completion of the case, the trial judge entered judgment in favor of McMil-lion and against JOH for $116,624.83, and in favor of JOH against CyanamM for the same amount. JOH’s claim for additional payment under the contract was denied. This original judgment was corrected on motion for a new trial to reflect Cyanamid’s earlier $45,000.00 payment to McMillion, leaving a final judgment of $71,624.83. In his brief reasons for judgment, the trial judge stated pertinently:
The contract between JOH and American [Cyanamid] was a fixed price contract and provided that the project should be completed within 75 days for a price of $224,-000.00. Because of an explosion caused by the excavation of an electrical box on American Cyanamid’s premises, the project was not completed until four months after the contract date. JOH brought this suit seeking an equitable adjustment of its contract because of the delay caused by the explosion. The Court finds no basis for the imposition of an equitable adjustment of the fixed price contract, and this portion of JOH’s claim should be denied. During the period immediately following the explosion, American Cyanamid requested that JOH perform certain work not contemplated in the original contract between these parties. American Cyan-amid was billed separately for this work and these, bills were paid. However, McMillion Dozer Services, Inc. was asked by JOH to leave its equipment on the job site in case it was needed for repairs necessitated by the explosion; this was done with the knowledge of American Cyanamid and for its benefit. McMillion’s bill has not been paid; American Cyanamid should pay JOH the amount of this bill and JOH should in turn pay McMillion.
JOH now appeals that portion of the judgment dismissing its claim Rfor additional payments. Cyanamid has satisfied the judgment in favor of McMillion, but now cross-appeals seeking reimbursement from JOH under the contract.
We first address JOH’s appeal in which it urges four assignments of error. The first two assert that under the “equitable adjustment” clause of the contract it was entitled to additional payments because of changes in the scope of the work due to the electrical line problem, the late permits, and the excessive water. As best as can be determined, the third assignment asserts that Cyanamid breached the contract by not supplying accurate drawings for the structure containing the electrical line. The last assignment alleges that during the electrical problem and the later maintenance shut-down Cyanamid personnel assured JOH that it would be compensated for all of its lost time at the end of the job, and that it relied upon these representations to its detriment.
These assignments for the most part involve factual determinations made by the trial judge. The established standard of review of such determinations is that they will not be upset on appeal unless they are manifestly erroneous. In Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993), the court reiterated that application of this standard involves a two part inquiry for reversal of factual findings. First, the court must determine that a reasonable factual basis does not exist for the trial court finding. Then the court must further determine that the entire record establishes that the finding is clearly wrong or manifestly erroneous. In the present case, we find that there was a reasonable basis in the record to support the trial court’s findings, and that the entire *1243 record does not otherwise establish that those findings were manifestly erroneous.
|7In its first two assignments, JOH argues basically that an adjustment to the contract price should have been made because the scope of the work changed, citing the electrical line problem, delayed work permits, the shut-down, and excess water. As the above recitation of the evidence shows, there was a reasonable factual basis in the record to support the conclusion that none of these factors constituted a change in the scope of the work sufficient to trigger the “equitable adjustment” clause of the contract. As to severance of the electrical line, there was no dispute that when the concrete structure was encountered JOH sought advice from Cyanamid as to how to proceed. Neither was it disputed that Raymond Thompson of Cyanamid gave instructions to excavate all around the structure to ascertain whether anything went into or out of it, and if not to dig it out. Apparently, this excavation was not thoroughly done and the wires were not discovered, but no finding of fault on the part of either Cyanamid or JOH was made. The trial judge did note in his reasons for judgment that severance of the line caused delay in completion of the job, but he also found that Cyanamid had amended the contract in writing by giving JOH additional projects to work on during this period. His rejection of JOH’s claim was thus, at least implicitly, based on a factual finding that any changes in the work conditions which had resulted from the severed line were adequately compensated for by the extra projects.
As to the permit problem, the record showed that when JOH bid the job it was familiar with the permit procedure and obviously knew that there were brief delays daily in the issuance of those documents. And again, while there was evidence to show that after the accident and during the maintenance shut-down other contractors were given preference in getting |8their work permits, Cyanamid did give extra work to JOH which was not significantly affected by these delays. As to the water problems, these resulted from a rainy summer, and not from any conditions attributable to Cyanamid, Further, Thompson testified that JOH did not have large enough pumps to handle the volume of water and he so advised its supervisor, but to no avail. Considering all of this evidence, it is clear that there was a reasonable basis in the record to support the conclusion that neither the permit delays or the rain constituted changes in the scope of the work which would justify equitable adjustments to the fixed-price contract at issue.
JOH also argues in this second assignment that because McMillion was awarded payment for additional equipment rental caused by the electrical accident, it was legally inconsistent for the trial judge not to award JOH a similar payment. We disagree. McMillion's contract was in two parts: one part was a fixed-price agreement for some $48,000.00, and the other was for equipment rental on a hourly basis. There was no real dispute that McMillion’s final bill was correct under the two part contract. The only question at trial was who would be required to pay it. The trial judge made a factual finding that JOH had requested, with Cyanam-id’s knowledge and for its benefit, that McMillion leave its equipment on the site after the electrical accident in ease it were needed for electrical repairs, and thus that Cyanamid was ultimately liable for the bill. This situation is clearly distinct from that of JOH, which was assigned additional work and paid for it during the period after the accident.
In its third assignment JOH apparently argues that the failure of Cyanamid to provide details of the electrical box and wire constituted ajgbreach of the contract giving rise to damages. As the above evidence shows, however, Thompson testified, and the bid plans verify, that the bidders were informed that the details of underground works could be found in drawings in Cyan-amid’s engineering office if any problems arose. Further, the absence of these details in the bid drawings became immaterial once the box was encountered and further discussions were held as what exactly it was and how next to proceed. It is evident that the failure to discover the line at that point and during the subsequent exploratory excavations was not due to a breach of the contract *1244 on anyone’s part, but rather to mutual inadvertence.
The final error urged by JOH is that it was promised extra payments by Dantin and Tom Call, a plant supervisor, if it kept its crews on the job during the electrical repair and the shut-down, and that it relied on these representations to its detriment. JOH presented no evidence on this point, other than general comments that Cyanamid would take care of JOH for lost time. Dantin testified that the extra work was for the most part given to take up this slack time. Tom Call, for his part, denied making any such representations. On the evidence of record, we find no manifest error in the trial judge rejecting JOH’s detrimental reliance claim.
The last issue here is Cyanamid’s answer to the appeal. Cyanamid asserts that the job ultimately cost it more than $100,000.00, over the contract price of $278,000.00, and argues that under the lien indemnity clause of the contract it is entitled to recoup these costs from JOH. It was stipulated at trial that Cyanamid had retained $66,000.00, from JOH’s final contract price, and had paid $104,000.00, in liens, leaving a difference of $38,000.00, above contract price. It was not disputed that | ipthe unpaid bill for McMillion was $116,000.00, and judgment was originally entered for that amount, but reduced to $71,-000.00, to reflect a $45,000.00, pre-trial payment. This evidence shows that Cyanamid thus paid $109,000.00, above the contract price. However, the judgment against Cyan-amid and ultimately in favor of McMillion was basically for additional equipment rental after the electrical accident and later shutdown, and was not related directly to the JOH contract.
At the motion for a new trial, Cyanamid urged that at least some of the costs reflected in the judgment were, indeed, a part of the JOH contract and that an additional credit should have been given for at least that portion of the bill. The trial judge specifically rejected this argument on grounds that the amount of the McMillion bill had not been contested, and no evidence was developed to establish what portion of that bill may have related to the original work. He further commented that in this circumstance, any credit which he might give would have to be based on speculation, rather than evidence, and this he declined to do. The above determinations are clearly based on a reasonable view of the evidence of record, and we therefore must affirm the actions of the trial judge on these points.
For the foregoing reasons, the judgment of the trial court is hereby affirmed.

AFFIRMED.